UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION AT COVINGTON

CIVIL ACTION NO. 2:19-CV-135 (WOB-CJS)

TRITON SERVICES, INC.                                    PLAINTIFF

VS.                     MEMORANDUM OPINION AND ORDER

CENTURY CONSTRUCTION, INC.                                DEFENDANT

Plaintiff Triton Services, Inc. (Triton) brought this action against Defendant Century Construction, Inc. (Century) for violations of the Kentucky Fairness in Construction Act (KFICA), breach of contract, and unjust enrichment. (Doc. 1). Triton specifically claims that Century is improperly holding a retainage under a construction subcontract between them, amounting to a violation of the KFICA and breach of contract, and that Century is responsible for delay and labor inefficiency, also amounting to breach of contract. (*Id.*). Century filed a Motion for Summary Judgment on all claims asserted by Triton. (Doc. 39). Having reviewed the parties' pleadings, the Court now issues the following Memorandum Opinion and Order.

I. **BACKGROUND**

On October 15, 2016, Century contracted with the Boone County Board of Education ("the Owner") for $25,498,800 for the

construction of a new middle school ("the Project"). (Doc. 46-8, General Contract, at 3). On October 24, 2016, Triton entered into a subcontract ("the Contract") with Century to complete the HVAC system for the school, (Doc. 1-1, Century-Triton Subcontract), and later amended by change order to include the installation of the plumbing system, as well, (Doc. 1-2, Change Order). The general contract provided that the Project was to take 20 months in total, to be ready for occupation by June 1, 2018, and ending completely on July 1, 2018, (*See* Doc. 46-8 at 3). The subcontract between Century and Triton would be completed in accordance with a separate schedule of Century's design that was yet to be finalized. (Doc. 1-1 at 2). Other than the general 20-month timeframe for the Project, Triton's own time of performance was not otherwise specified in the Contract with Century. (*See id.*). The total price of the Contract between the parties after several change orders was $4,532,923.00. (Doc. 1 at ¶ 8).

Triton's work on the Project began in March 2017 and was not completed until September 2018. (Doc. 1 at ¶¶ 11, 17). As the school was scheduled to be open for the 2018 school year, Century had Triton work overtime to complete the Project sooner. (*Id.* at ¶ 12). As mentioned, Triton claims that since completion, Century has improperly held $226,646.15 as retainage, which happens to be 5% of the Contract price, even after Triton completed its work on the Project. (Doc. 46 at 10). Century raises two main points

justifying its "retainage": first, that the Owner has yet to
disburse the same funds to Century, relieving it of its obligation
to pay the balance; and, second, the amount retained is exactly 5%
of the total contract price, which is the amount the KFICA allows
Century to withhold in such situations. (Doc. 40 at 1-2).  Then,
as to Triton's breach of contract and unjust enrichment claims for
allegedly uncompensated overhead and labor costs, Century argues
the Contract already provides for the costs and services between
the parties—accounted for in the contract price, a lump sum already
firmly agreed to, and the overtime premiums it paid—and that Triton
gave untimely notice of its delay claim.

## II.  ANALYSIS

For Defendant Century to prevail on its Motion for Summary
Judgment, it must establish that there is no genuine dispute of
material fact as to whether it violated the KFICA, breached its
Contract with Triton, or was unjustly enriched.  Summary judgment
is appropriate "if the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the
affidavits, if any, show that there is no genuine issue as to any
material fact and that the moving party is entitled to a judgment
as a matter of law." FED. R. CIV. P. 56(c).  Under this standard,
the Court views the evidence and draws all reasonable inferences
in the light most favorable to the non-moving party. *Lanman v.
Hinson*, 529 F.3d 673, 679 (6th Cir. 2008).  Still, the "mere

existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)).  After the moving party shows that there is an absence of evidence to support the non-moving party's case, the non-moving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Companies*, Inc., 8 F.3d 335, 340 (6th Cir. 1993).

A federal court sitting in diversity must apply the law of the forum state, including its law governing contracts. *See City of Wyandotte v. Consol. Rail Corp.*, 262 F.3d 581, 585 (6th Cir. 2001).  "The interpretation of a contract, including determining whether a contract is ambiguous, is a question of law." *Superior Steel, Inc. v. Ascent at Roebling's Bridge, LLC*, 540 S.W.3d 770, 783 (Ky. 2017).  Contract interpretation, therefore, is a question for the Court, and not for a jury. *See id*. *See also City of Wyandotte*, 262 F.3d at 585 (citing *Sault Ste. Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 373 (6th Cir. 1998)). Whether a breach of contract occurred given the evidence, however, is a question of fact for the jury, in this instance subject to the just-described summary judgment standard. *See Schmidt v.*

*Schmidt*, 343 S.W.2d 817, 819 (Ky. 1961); *Harlan Fuel Co. v. Wiggington*, 262 S.W. 957, 958 (Ky. 1924).

Where the contract language is unambiguous, the Court is to interpret the contract in accordance with the plain meaning of the words used by the parties, with a mind to effectuating the manifest intent of the parties. *Kentucky Shakespeare Festival, Inc. v. Dunaway*, 490 S.W.3d 691, 694 (Ky. 2016). Even where the contract is ambiguous, the Court's primary purpose will be to discern and apply the intention of the parties. *See id.*

### A. **KFICA**

#### 1. **Retainage Amount**

The KFICA was created to "help level the playing field between contractors and owners." *Louisville & Jefferson Cty. Metro. Sewer Dist. v. T+C Contr. Inc.*, 570 S.W.3d 551, 558 (Ky. 2018). Under the Act, "retainage held after fifty-one percent (51%) of the construction project has been completed shall not be more than five percent (5%) of the total contract amount." KRS § 371.410(1).

Triton argues that Century violated the KFICA by withholding more than 5% of the total contract amount, whereas Century claims that it has withheld exactly 5% as the KFICA allows. (Docs. 1 at ¶ 39; 40 at 11). Triton offers no rebuttal to this point. (Doc. 46). The total contract amount is $4,532,923.00, and Century has withheld $226,646.15, which is an exact 5% balance. (Doc. 40 at

5

11).  Because Century has not exceeded the 5% allowed by the KFICA,

the amount of retainage itself does not violate state law.

### 2. Retainage: Pay-if-Paid

Under the KFICA:

> A contractor shall pay its subcontractors any undisputed
> amounts due within fifteen (15) business days of receipt
> of payment from the contracting entity, including
> payment of retainage if retainage is released by the
> contracting entity, if the subcontractor has provided a
> timely, properly completed, and undisputed request for
> payment to the contractor.

KRS § 371.405(8).  Triton contends that Century has violated this

statutory provision by failing to pay the full price of the

Contract after Triton fully rendered construction services and

Century received adequate funds from the Owner, (Doc. 1 at 6).[1]

KRS § 371.400(3).  Century counters that it is not required to pay

Triton until the Owner has made final payment, which it claims it

has not received. (Doc. 40 at 10).

Both parties cite Kentucky case *Superior Steel, Inc. v. Ascent*
*at Roebling's Bridge, LLC*, 540 S.W.3d 770(Ky. 2017), in which a

"pay-if-paid" clause was enforced where the contract clearly

provided that the Owner's payment to the contractor was a condition

precedent to the contractor paying the subcontractor. (Docs. 40 at

10; 46 at 23).  Century argues the Contract in this case is similar

in that it does not require Century to pay until it has received

---

[1] To be clear, the Owner, Boone County, is the "contracting
entity" under KRS § 371.405(8).

6

full payment from the Owner. (*See* Doc. 40 at 10). Triton, however, argues that the present case is distinguishable because the Contract here does not contain the same "condition precedent" language. (Doc. 46 at 23).

Courts generally do not enforce a pay-if-paid clause unless it is clear and unequivocal. *See Superior Steel*, 540 S.W.3d at 784. But the Kentucky Supreme Court ruled in *Superior Steel* that specific "'pay-if-paid' language, coupled with the express use of 'condition precedent,' unequivocally allocate[d] the risk of nonpayment by the Project owner to [the subcontractor] and relieve[d] [the contractor] of the obligation to pay until it receive[d] payment from [the Project owner]." *Id.* at 785.

Section 22(e) of the Contract states that "[Century] shall make a final payment to [Triton] . . . *after* the Owner shall have made final payment to [Century] for [Triton]'s work." (Doc. 1-1 at 6). Triton insists this language does not clearly establish a condition precedent. (Doc. 46 at 23-24). While the contract does not use the term "condition precedent" like in *Superior Steel*, the parties' intent here was to establish a condition, evident by terms of contingency like "only after." *See* 13 Williston on Contracts § 38.16 ("Notwithstanding the fact that no particular words are necessary to create a condition,... words and phrases, including 'when,' 'while,' '*after*,' or 'as soon as,' have been deemed to indicate that the promise is conditional and not to be performed

7

until the event referred to is performed or occurs.") (emphasis added).  Section 22(e) still clearly states that payment will not be due to Triton unless Century is paid in full. (Doc. 1-1 at 6). The Court finds the plain, unambiguous meaning of this language clearly creates a condition precedent, that Century may withhold payment until it receives final payment from the Project Owner.

This conclusion holds, however, only if Century is not otherwise the reason the condition was not satisfied, i.e., it is not the reason the Owner withheld final payment.  Under Kentucky law, Triton assumed the risk of non-payment from the Owner in that case.  If, however, Century is the reason the condition was not met, i.e., it is Century's fault the Owner withheld payment on account of Century's allegedly deficient performance, then it may not withhold the amount from Triton.  For reasons explained at greater length for Triton's breach of contract claims, namely that Century cannot rely on a condition whose satisfaction it has prevented from occurring, a material question of fact exists as to why the condition was not satisfied.  While holding retainage may not be a per se violation of the KFICA given the pay-if-paid clause in this Contract, Century would be required to pay what it has retained if it was at fault for the Owner's nonpayment, or if it has no other reason not to pay for Triton's fully rendered services.  Thus, summary judgment on this claim for improper retainage under the KFICA is denied.

8

B. **Breach of Contract**

Triton also claims Century breached the Contract in a number of ways, including failure to pay the outstanding contract balance and for forcing Triton to sustain various forms of damages from Century's delay and mismanagement of the Project. (Doc. 1 at 5). However technically characterized, Triton alleges multiple forms of economic harm were caused by Century's delay and lack of management, including "extended home office overhead, failure to pay Triton for its lost productivity, failure to pay Triton for other labor losses, failure to establish a completion date and thereby trigger warranties, and failure to pay Triton its other damages suffered on the Project." (*Id.*).

Triton presents some evidence tending to show that Century failed to manage the Project so as to allow for timely and orderly progress amongst the subcontractors. For instance, the record evidence would seem to prove Century's projected completion date of about July 2018 was not met. (*See* Doc. 46-1, Hodge Dep. at 12:2-14:4). One reason to infer this is Triton's continued involvement in the Project in September 2018, about three months past the 20-month timeframe originally projected for the Project's completion, much to the apparent ire and frustration of the Owner. *See* discussion *infra* Section II.B.2. The circumstances surrounding the Project's delay raise questions as to why certain contractual conditions were not met, such as the pay-if-paid clause and the

9

notice clause discussed below, both conditions Century claims protects it from liability to Triton.

Century retorts in four ways: (1) generally, there is no way to quantify the true dollar amounts of some of these forms of damages; (2) there is a "notice provision" in the Contract pertaining to delay claims that Triton failed to satisfy, barring its claims for damages arising from delay; (3) the timeframe between Century and Triton was met anyway, as it only required Triton's services for 18 months from when Triton actually began work in March 2017 to September 2018; and (4) the Contract price is a "firm" lump sum, so Century is not obligated to pay any more than that amount and Triton must accept that price whatever the cost of the work was.

Before proceeding, the Court addresses Century's first point and finds it to be without merit.  Triton basically claims "delay damages" in various forms, a term of art that refers to economic damages arising from breach of a subcontract by a contractor's delayed management or performance. *See T+C Contracting*, 570 S.W.3d at 567.[2]  Such delay damages can be proven and disputed by evidence before a factfinder.  Much more abstract and speculative bases for

---

[2] "'[D]elay damages,' as contemplated in construction law, have a precise and technical meaning: Under construction law,... [d]elay damages refer to damages arising out of delayed completion, suspension, acceleration or disrupted performance; these damages compensate the contracting party that is injured when a project takes longer than the construction contract specified." *T+C Contracting, Inc.*, 570 S.W.3d at 567 (quoting *Cty. of Galveston v. Triple B Servs., LLP*, 498 S.W.3d 176, 181-82 (Tex. App. 2016) (citing 1A *Bruner & O'Connor Construction Law* § 15:29)) (quotations omitted).

damages than delay damages are awarded all the time under Kentucky law. *See, e.g., Louisville SW Hotel, LLC v. Lindsey*, 636 S.W.3d 508, 517 (Ky. 2021)(recognizing jury discretion to award the future earnings of a child to his estate in a wrongful death suit). The time and amounts owed Triton for costs beyond what was otherwise anticipated by the Contract are calculable, in theory at the very least, and their basis just as readily challenged by Century's own evidence. Although measuring such damages can be difficult—to the point experts refer to their measurement as a potential "Gordian Knot," 6 *Bruner & O'Connor Construction Law* § 19.1—traditional contract principles of expectancy, reliance, and warranty apply to construction contracts, and can be argued and calculated accordingly. Thus, Century's assertions that such damages are not calculable or real do not justify summary judgment given the evidence of serious delay. The Court will now address Century's three remaining contract-based arguments below.

### 1. Notice

Century argues Triton's delay claim is untimely because the Contract requires notice of such a delay claim within 48 hours of the commencement of the delay; thus, Triton should be barred for failure to satisfy yet another condition of recovery. (Doc. 40 at 12). Century refers the Court to Section 11(d) of the Contract, which indeed states that a claim for delay of work must be

11

"presented within forty-eight (48) hours of the commencement of such delay." (Doc. 1-1 at 4).

Triton contends Section 11(d) merely refers to requests for extensions of time arising from delays, rather than resolving disputes more generally. (*See* Doc. 46 at 15).  It argues that Section 28(c) of the Contract is more applicable, which only requires notice of a dispute be sent to Century "within a reasonable time after the dispute has arisen." (Doc. 1-1 at 8). Triton argues that because Section 28(c), not Section 11(d), is more applicable here, so Triton was only required to give Century notice within a reasonable amount of time, not strictly within 48 hours. (Doc. 46 at 15).  Further, Triton argues that the notice provision under Section 11(d) is unenforceable as against public policy. (Doc. 46 at 16).

Century is correct that Section 11(d) applies.  Even if the two provisions cover the same subject matter and thus create some redundancy, the Court may rely on a canon of construction: "Where they are inconsistent, general terms and provisions in a contract ordinarily yield to specific ones, and the meaning of general words will be restricted by more specific terms; however, where both general and special provisions may be given reasonable effect, both are retained." 17A C.J.S. Contracts § 433.  While Section 28(c) refers to dispute resolutions more generally, Section 11(d) specifically discusses delays and how derivative claims are to be

12

preserved. (Doc. 1-1 at 4, 8).  Because Section 11(d) more
specifically applies to delay claims, the Contract required Triton
to give notice within 48 hours of "the commencement" of any "such
delay" to preserve that claim.

Section 11(d) reads:

In the event that [Triton] is delayed in the prosecution
or completion of the Subcontractor's Work by the act,
neglect or default of the Owner or Century..., then the
time stated for a period equivalent to the time lost by
reason of any of the specified causes, which extended
period shall be determined and fixed by the Architect,
or by Century if no Architect has been employed; but no
such allowance shall be made unless a claim is presented
in writing to Century within forty-eight (48) hours of
the commencement of such delay.  Such extension of time
shall release and discharge Century from any claims
[Triton] may have on account of any of the specified
causes of delay.

(Doc. 1-1 at 4).

The KFICA provides that any "provision that purports to waive,
release, or extinguish the right of a contractor or subcontractor
to recover costs, additional time, or damages, or obtain an
equitable adjustment of the contract, for delays in performing the
contract that are, in whole or part, within the control of the
contracting entity" is against public policy and shall be void and
unenforceable, unless the contract provides for binding
arbitration or an alternative dispute resolution mechanism as a
prerequisite to litigation.  KRS § 371.405(2)(a).  Still, the
Kentucky Supreme Court held in *T+C Contracting* that
KRS § 371.405(3) permitted a contract provision that required 10-

days' notice to preserve a delay claim, measured from the date of discovery of the delay. *See T+C Contr., Inc.*, 570 S.W.3d at 561. So as a general matter, as Century argues, such notice provisions are not per se violative of public policy in Kentucky.  But given the record evidence, the effect of strict enforcement of Section 11(d) deserves further examination for the following reasons.

Section 11(d) imposes a condition precedent to suit or recovery that favors Century, evident, for instance, in the use of the term "unless" with reference to Triton's giving notice within 48 hours. *See A.H.A. Gen. Const., Inc. v. New York City Hous. Auth.*, 699 N.E.2d 368, 374 (N.Y. 1998)(cited by Philip L. Bruner and Patrick J. O'Connor, Jr., 5 *Bruner and O'Connor on Construction Law* § 4.35) (holding a notice provision requiring prompt notice and documentation of claims for extra or disputed work is a condition precedent, as distinct from a full exculpatory "no-damages-for-delay" clause); 13 Williston on Contracts § 38:16 (4th ed.).  The Court observes:

> [C]onditions precedent are linked to the implied obligation of a party not to do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.  Thus, it is a well-settled and salutary rule that a party cannot insist upon a condition precedent, when its non-performance has been caused by himself.  Put another way, a party to a contract cannot rely on the failure of another to perform a condition precedent where he has frustrated or prevented the occurrence of the condition.

5 *Bruner and O'Connor on Construction Law* § 4.35 (quoting *A.H.A. Gen. Const.*, at 374 (citations and quotations omitted)).  This passage pertains here for two important reasons.

First, given the evidence Triton has presented, there is a material question of fact as to how and why the Project in this case was so delayed beyond the expectations of the Owner, with Century at the helm.  More directly, it is relevant here whether the costly delays Triton alleges were caused by Century's mismanagement or neglect, i.e., its failure to perform its managerial obligations to the Owner and to subcontractors like Triton, and whether such delay was tolerable under the terms of the Contract.  There exists ample testimony, especially among representatives of the Owner and the architect, that Century caused Project-wide delay over the course of a major 20-month project.[3]  Moreover, Triton has presented evidence that the Project was finally completed no earlier than September 2018, perhaps later for official certification of completion,[4] approximately 23 months after the arguable October 2016 start date.  Triton claims and has

---

[3] *E.g.*, Docs. 46-11, 6-7-2017 Email from Federle to Hodge; 46-12, 6-8-2017 Email from Razor to Hayes; 46-16, 1-4-2018 Email from Hayes to Poe; 46-17, 3-6-2018 Email from Segre to Sanders and Hayes; 46-18, 3-2-2018 Email from Hayes to Dusing ("Century keeps softly using overtime but it all comes down to money for them.  They keep hanging there[sic] hat on the large amount of rain and extreme cold."); 46-20, 7-1-2018 Email from Hayes to McArtor ("Every day from here on out is valuable, every minute, every hour is valuable to that turnover rate…. I'm here at 10:30. Plumbers [(presumably Triton)] on site, not sure how many. 2 roofers. About 7 cars in the lot.  I don't see anyone from Century at this time.").
[4] Doc. 46-26, Certificate of Completion (date September 13, 2018).

presented evidence these delays caused it to have to work beyond the 20 months it agreed to and that it incurred costs it would not have as a result.

Second, and furthermore, the very feasibility of Triton ascertaining the "commencement" of each discrete delay on Century's part, given the nature and extent of the delays, raises the question of whether Triton's satisfaction of the notice condition was frustrated or made effectively impossible by Century.  The provision presumes Triton could know *and* react to discrete delays within 48 hours of the delay event actually occurring.  It makes no provision for whether Triton could have known, discovered, or been alerted to the condition causing delay, making this provision very distinct from that in *T+C Contracting*. As Triton has presented evidence that Century may have been too often absent from the site and that it left the subcontractors unorganized, (*See, e.g.*, Doc. 46-20), this raises a question as to the sheer feasibility of compliance.  Such questions are compounded by the nature of Triton's HVAC and plumbing systems, which would presumably run throughout the building and would apparently require Triton's extended involvement in the Project in various stages and installments depending on the progress of other subcontractors.

Both parties can present evidence that the notice provision was feasible or infeasible to comply with given the circumstances.

16

But a party whom a condition disfavors cannot be held to a condition whose satisfaction is frustrated or made infeasible by the party it favors. *See A.H.A. Gen. Const.*, 699 N.E.2d at 374. If compliance was feasible, Section 11(d) would likely bar Triton's delay claims under *T+C Contracting*. If compliance was infeasible or impeded by Century, Section 11(b) would be against public policy under KRS § 371.405(2)(a) and would be an unlawful bar to Triton's delay claims. It remains a question of fact whether Century's actions effectively frustrated Triton's ability to comply with the condition precedent in Section 11(d), as the condition is tied to the actual "commencement" of "a delay," two more factual issues for which there is conflicting evidence. Thus, the parties may present evidence as to whether Triton's delay claims are barred by Section 11(d) or not.

### 2. Timeline

The 20-month duration of the Contract has already been discussed as well, but should be resolved summarily as a matter of contract interpretation. Fortunately, the Contract here is quite clear.

Century argues that the "20 months" the Contract refers to in Section 2.2 does not apply to the overall construction of the school. Rather, it frames the time for services between Century and Triton alone, regardless of other subcontractors or the expected timeline for the entire project. Century argues that it

17

ultimately required Triton's services for no longer than 20 months, that Triton only worked for about 18 months from March 2017 to September 2018, and thus it experienced no delay.  Triton argues that the Contract's timeframe of "20 months" refers to the duration of the whole Project, especially since its HVAC and plumbing installation were reasonably expected to be complete in about 14 to 16 months.

"Project completion is 20 months" in Section 2.2 of the Contract certainly confines Triton's commitment to Century to completion within 20 months. (Doc. 1-1 at 2).  But what does "Project" mean in this context?  The word "Project" is helpfully defined by parentheses in the Contract's preamble to mean "a certain project located at 7515 Shamrock Avenue, Union, KY 41091," which most reasonably means the school located at that address.  The word "Project" is also apparently distinct from "Subcontractors Work," a term introduced in Section 1 specifically distinguishing the scope of Triton's contribution from other contract terms. (*Id.*).  Thus, the 20-month timeframe applies to the overall construction of the school.

Under Section 2.2, subtitled "Schedule," Century was to make a schedule to which Triton as a subcontractor would have to adhere. (*See id*).  The specifics of Triton's schedule in the context of the Project was to be determined at Century's discretion. (*See id.*).  This is consistent with the common working relationship and

18

duties between contractor and subcontractor, under which the latter works at the direction and behest of the former. *See* 5 *Bruner & O'Connor Construction Law* § 15:19; § 15:33 ("An express or implied condition in every construction contract is the contractor's duty properly to manage, schedule and coordinate the work of its various subcontractors and suppliers to achieve timely performance."). But "a provision of the subcontract giving a general contractor the right to direct the sequence or general progress of the work does not release it from liability for delay." *See id.* at § 15.19 (quoting *J. J. Brown Co. v. J. L. Simmons Co.*, 118 N.E.2d 781, 785 (Ill App. Ct. 1954)). Rather, it "implies an obligation on the part of the general contractor to keep the work in such state of forwardness as to enable a subcontractor to perform within a limited time." *Id.*

The Court finds as a matter of contract interpretation that Century and Triton agreed to 20-month overall timeframe for completion of the middle school in its entirety, and that Triton's HVAC and plumbing work was simply subject to a more flexible schedule for subcontractors *within* that 20-month window of time.

The Contract does not specifically prescribe the start date, but Triton has presented evidence that the date of Project commencement, according to Century documents, may have been sometime in late October 2016, perhaps specifically October 20,

19

2016. (*See* Docs. 1-1 § 2.2; 46-9, Century Milestone Dates).[5] While the true commencement of construction can be a point of contention subject to industry standards and other evidence, it is generally a question of fact for which both parties should present further evidence. 5 *Bruner & O'Connor Construction Law* § 15.13.  If the earliest point of commencement was October 2016, the end of the 20 months for Project completion would be around late June 2018, perhaps June 20, 2018.

Not only does that date comport with terms of the general contract, (Doc. 48-8 at 3), as well as the Owner's expectation that the entire school would be ready to be occupied for the start of that school in August, it also explains the statements in emails from the Owner's representatives that Century was seriously late for not having completed the school by September 2018. (*See* Doc. 46-23, Email from McArtor to Bowles and Poiry).  Indeed, the affidavit of Triton's CEO indicates he was also under the impression that the entire project was to take a total of 20 months. (*See* Doc. 46-1 at ¶ 13 ("considering that the entire project had a 20-month duration")).  And Century's own project manager Kevin Federle indicated Project completion was intended

---

[5] According to Century's own document called "Tentative Key Milestone Dates," the date of commencement would seem to be 10-20-16, with milestone "Mobilize" marked complete, or "hit," by the scheduled date of "10-20-16," with the next step "Mass Excavation complete 11-20-16." (Doc. 46-9).  Perhaps commencement is at milestone "Foundation start" on 1-9-17.  These matters must be resolved as a matter of fact.

for July 1, 2018, approximately 20 months after project commencement. (Doc. 46-3, Federle Dep. at 56:13–58:19). Thus, there is sufficient evidence that the 20-month timeframe would begin to run from the date of Project commencement in October 2016, not from March 2018 when Century claims Triton began its work on the site.

While the materiality and actual breach of the time term may be subject to debate and conflicting evidence, as it is here, time is still typically a material term, and failure to adhere may constitute breach. 5 *Bruner & O'Connor Construction Law* § 15:17 ("There is little dispute in the construction industry today that time, as a practical matter, is a material condition of the contract. . . ."). This is especially so where a contract refers to time as being "of the essence," as this Contract has in Section 11(a). (Doc. 1-1 at 4). The reason for delay remains a dispute of material fact supported by Triton's record evidence. *See* 5 *Bruner & O'Connor Construction Law* § 15:33 ("An express or implied condition in every construction contract is the contractor's duty properly to manage, schedule and coordinate the work of its various subcontractors and suppliers to achieve timely performance."). A "provision of the subcontract giving a general contractor the right to direct the sequence or general progress of the work does not release it from liability for delay." *See id.* at § 15.19 (quoting *J. J. Brown Co. v. J. L. Simmons Co.*, 118 N.E.2d 781, 785 (Ill

21

App. Ct. 1954)). Rather, it "implies an obligation on the part of the general contractor to keep the work in such state of forwardness as to enable a subcontractor to perform within a limited time." *Id.*[6]

Accordingly, while the total timeframe of 20 months seems clear, the timeframe's commencement and completion date and the reasons for its extension remain points of contention. The Court thus declines to resolve such matters by summary judgment. Since time is a key part of Triton's basis for its breach of contract claims, summary judgment must be denied.

### 3. Lump Sum

The Court turns now to a matter of compensation. Century argues next that Triton cannot recover delay damages because the parties agreed to a lump sum payment. (Doc. 40 at 17). Further, Century indicates that Section 11(b) of the Contract states that it can require Triton to work overtime in exchange for an overtime premium. (Doc. 1-1 at 4). Triton argues that the overtime work it performed necessitated expenditures of money and labor it would not have incurred but for Century's delay, even if some of its

---

[6] "One who makes a contract never can be absolutely certain that he will be able to perform it when the time comes, and the very essence of it is that he takes the risk within the limits of his undertaking. The modern cases may have abated somewhat the absoluteness of the older ones in determining the scope of the undertaking by literal meaning of the words alone.... But when the scope of the undertaking is fixed, that is merely another way of saying that the contractor takes the risk of the obstacles to that extent." *Day v. United States*, 245 U.S. 159, 161 (1917) (Holmes, J.).

22

work was compensated in part by the overtime premium, and that such work is therefore not covered by the lump sum. (Doc. 46 at 14). Triton thus argues that it could not have anticipated having to work "$138,060" in overtime due to a compressed schedule caused by Century's delays, especially given the estimated "10-20%" lesser productivity per man hour in overtime. (*Id.* at 22). Triton estimates it actually expended 28,914 labor hours, amounting to an estimated labor-cost overrun of $404,997. (*Id.* at 9).

Of course, a lump sum contract involves two parties who agree to a single payment, largely without regard to the ultimate back-end costs incurred by the parties. *United States v. Leigh*, 515 F. Supp. 405, 409 (S.D. Ohio 1981). Section 2.1 of the Contract states that Century will pay Triton a "sum," indicating a sum certain, of $3,110,400 for the project. (*See* Doc. 1-1 at 2). That price was changed by separate agreements, e.g., "Change Order #1," (Doc. 1-2), increasing the contract price up to a total of $4,532,923.00, (Doc. 1 at ¶¶ 7–8), but the word "sum" would still presumably apply through the change to the final price figure. And the Contract also specifically reads: "Th[is] Subcontract price *is firm*...." (Doc. 1-1 at 2). Thus, it could not be clearer that the amount Century agreed to pay is a fixed price for Triton's furnishing necessary materials and labor to Century.

23

At a glance, then, it would seem that absent an agreement from Century or given Century's payment of an overtime premium, the lump sum is the price Triton simply must accept.  To Century's point, Triton must demonstrate why the supposedly extra work it performed was so beyond the scope of the work it agreed to do that it must be compensated over and above the Contract's "firm" sum-certain price.  But corresponding to the contract price is the Project time.  Triton agreed to work for 20 months, and presumably that duration, as a material contract term, necessarily factored into Triton's bid price, the lump sum figure.  To the extent Triton was working during that multi-month time extension into September 2018, it may have sustained costs above what it would have had the Project been completed on time.  Century cannot simply characterize such labor as "overtime," because "overtime" work is inherently that extra work performed within an already contemplated or set timeframe, the 20 months Century promised.

As a material term corresponding to the various economic realities of construction contracts, the firmness of the lump sum price was, absent an altered agreement, dependent on the fulfilment of the promise that Triton would only be required to work the Project for a maximum of 20 months.  The extent of the extra-contractual costs is a question of fact for which evidence ought to be and may be presented at trial.

### 4. *Eichleay* Damages

Triton also seeks *Eichleay* damages for extended overhead costs from delay. Century argues that *Eichleay* damages are unavailable in this dispute because no Kentucky court has adopted *Eichleay*, and any delay was not occasioned by the government in the first place. (Doc. 47 at 6). Triton argues *Eichleay* damages should be available because although no Kentucky court has ever expressly adopted *Eichleay*, it has never declined to follow it, either. (Doc. 46 at 20). It argues the *Eichleay* formula is widely used across the United States, and more recently in contracts involving private parties as well. (*Id.*) (citing 6 *Bruner & O'Connor Construction Law* § 19:108)).

*Eichleay* damages are used to compensate contractors for overhead costs that occur when a government or prime contractor's delay forces contract completion to be longer than originally anticipated. *Charles G. Williams Constr., Inc. v. White*, 271 F.3d 1055, 1057 (Fed. Cir. 2001). No Kentucky court has adopted *Eichleay.* The three elements required to recover *Eichleay* damages are (1) that a government-imposed delay occurred, (2) the government required the contractor to "stand by" during the delay, and (3) that the contractor was unable to take on additional work during the delay. *Satellite Elec. Co. v. Dalton*, 105 F.3d 1418, 1421 (Fed. Cir. 1997).

Because no Kentucky court has adopted *Eichleay*, Triton is unable to recover *Eichleay* damages per se. Even if this Court

decided *Eichleay* damages were available in Kentucky under the federal formulation, the delay was not even alleged by Triton to have been caused by a government contractor, so the formula would not apply under the weight of existing precedent.

### 5. Conclusion on Breach of Contract Claim

Ultimately, the plain language of the contract dictates that the Project was to be completed in 20 months, for a lump sum of money, and that the subcontractors' work would be scheduled within the discretion and at the direction of Century for that period. But because there is evidence that Century is responsible for delay beyond the 20 months Triton promised, and Triton's commitment to the Project was prolonged substantially as a result of such a delay, and because the nature, extent, and cause of the delay may have prevented Triton meaningfully from giving timely notice of its claim to Century, Triton has established a material dispute of fact that it suffered damages and costs related to extra labor, extended overhead costs, and perhaps other intangible opportunity costs. While it remains to be proven, Triton is entitled to a trial as to its breach of contract claims.

### C. <u>Unjust Enrichment</u>

Triton also alleges unjust enrichment for costs it expended in fulfilling its promises under the Contract allegedly not compensated by the lump sum price. Century argues that because there is a contract in place between these parties as to contract

price and the cost of labor, an unjust enrichment claim is not proper where the alleged benefit is part of the services Triton promised. (Doc. 47 at 14).  Triton argues, on the other hand, that it retains its right to sue under an unjust enrichment claim though the Contract exists. (Doc. 46 at 24).

An unjust enrichment claim allows a plaintiff to recover damages where a benefit is conferred upon the defendant at the expense of a plaintiff without compensation. *Superior Steel*, 540 S.W.3d at 778.  Three elements must be proven to support a prima facie unjust enrichment claim: "(1) benefit conferred upon defendant at plaintiff's expense; (2) a resulting appreciation of benefit by defendant; and (3) inequitable retention of [that] benefit without payment for its value." *Id.* at 778.  Unjust enrichment claims are rooted in equity, and because "law trumps equity," courts do not generally allow for unjust enrichment claims where there is already an express contract concerning the benefit conferred. *Id.*

Consistent with Triton's argument, the Kentucky Supreme Court wrote in *Superior Steel* that "the statement that there can be no unjust enrichment in contract cases is plainly erroneous." *Superior Steel*, 540 S.W.3d at 779 (quoting Restatement (Third) of Restitution and Unjust Enrichment at § 2, cmt. c (2011)).  But this observation only holds true in the more marginal case where "valuable performance has been rendered under a contract that is

invalid, or subject to avoidance, or otherwise ineffective to regulate the parties' obligations." *See id.*

Here, there is no question as to the existence or validity of the Contract between Century and Triton.   And although Triton argues, essentially, the *economic* inadequacy of the set contract price, the Contract's existence and validity is not otherwise in question.   The alleged uncompensated benefit, overhead and labor costs, were still necessary to furnish the HVAC and plumbing systems it promised it would provide to Century for a set price. Because a contract for defined services and goods exists, Triton cannot claim it unjustly enriched Century by having to pay more than it anticipated.   Triton's interests will be adequately protected in its claim for breach of contract, the legal and economic interest Triton had in working only for a maximum of 20 months.

## III.   CONCLUSION

Having reviewed this matter, and the Court being advised, Plaintiff Triton has established a genuine dispute of material fact sufficient to support its breach of contract claims against Defendant Century.   Accordingly, the Court being advised,

**IT IS ORDERED** that:

(1)   Century Construction, Inc.'s Motion for Summary Judgment (Doc. 39) be, and is hereby, **GRANTED** as to Triton's

unjust enrichment claim, but **DENIED** as to Triton's KFICA and breach of contract claims.

(2)   The parties are to confer and propose three (3) mutually agreeable trial dates between August 1, 2022, and December 16, 2022, via joint status report to be filed **on or before March 28, 2022.**

This 14th day of March 2022.



**Signed By:**

**_William O. Bertelsman_** WOB

**United States District Judge**